**REAMER INDUSTRIES, INC., Plaintiff,**

v.

**McQUAY, INC., Defendant.**

**Civ. A. No. 70–600.**

United States District Court,
D. South Carolina,
Columbia Division.

Nov. 4, 1971.

ORDER

CHAPMAN, District Judge.

This matter was tried before the Court in Columbia, South Carolina, without a jury on September 15 and 16, 1971. Lafaye-Tarrant Construction Company was prime contractor for the construction of the Orangeburg-Calhoun Technical Education Center and subcontracted to the plaintiff, Reamer Industries, Inc., the furnishing of labor, material and equipment to install the heating and air conditioning required by the plans and specifications prepared by the architect, Lyles, Bissett, Carlisle & Wolff. This subcontract included the installation of some 97 heating and air conditioning units. These are known as "fan coil units", and were purchased by the plaintiff from McQuay, Inc., through its representative Hoffman & Hoffman. The plaintiff subcontracted the furnishing and installation of controls on these heating units to Barber-Coleman Company.

The work was completed and the air conditioning and heating was put into operation in late August or early September 1968. On November 22, 1968, at approximately 3:00 a.m., a fire occurred in the lecture room of the educational center causing damage to the room and its contents. This occurrence took place before the owner had accepted the construction. The general contractor after making repairs for damages caused by the fire demanded payment from the plaintiff, contending that the fire was caused by a defective fan coil unit. The plaintiff paid the general contractor and this action seeks indemnification from the defendant, the supplier and manufacturer of such units on the theory of negligent design and construction and also for breach of implied warranty of fitness for the particular purpose of the equipment.

Plaintiff's position is that the fan coil units were negligently designed and manufactured in that McQuay violated good engineering practices and princi-

E. W. Laney, III, Columbia, S.C., for plaintiff.

W. Ray Berry, Columbia, S.C., for defendant.

ples by using two inadequate thermal relays wired in parallel as a contactor to open and close the electrical power circuit to the heat element in the fan coil unit, and that on the occasion in question the relays failed to break the circuit when required allowing the fan coil unit to be continuously energized until it overheated to the point that it burned the cabinet around the unit, destroyed the unit and caused damage to the contents of the lecture room.

The defendant McQuay contended that the relays were adequate to perform the task required and that it was impossible for the unit to overheat to the point that it could cause a fire, regardless of the alleged failure of the relays to break the contact with the power circuit. The defendant contended that the fire could have been caused by improper wiring, fluctuation in the voltage, a careless cigarette or some cause other than negligent design by the defendant.

The unit in question was a McQuay model SB–124, which contained a 7.5 kilowatt electric strip heater that was supplied by a 277 volt circuit. The normal line current for a 7.5 kilowatt, 277 volt single phase electric heater under normal operating conditions is 27 amperes.

In the construction of this heater the defendant used two Klixon thermal relays wired in parallel to make and break contact between the 277 volt power source and the heat element, when called for by the control system which was on a 120 volt circuit. The purpose of using two relays wired in parallel was to attempt to split the load between the two relays. The operation of the relay is dependent upon the heating and cooling of an element within the relay. Due to the nature of this thermal type operation, there is a time delay between the command from the thermostat controls and the actual break in the contact. This time delay varies and when two relays are wired in parallel they do not open and close simultaneously. Therefore, one relay, rather than both relays, carries the full load for a period of time.

Prior to the fire, there were complaints of overheating in these units and a number of the relays were removed and replaced. Upon testing the relays were found to be erratic and some of the relays removed showed evidence of damage. John Graves, electrical engineer for the architect, testified that the relays were checked to determine the length of the time delay. He testified that some would take one, two or three minutes to break contact and some would not break at all. Prior to the fire, Graves recommended that the relays be replaced with magnetic contactors which are electrically held contactors and which break contact instantly on command, with no time lag or delay.

Plaintiff's witnesses testified that the use of thermal relays as a contactor for this type unit and installation was poor engineering. Mr. Stevens, service manager of the defendant, admitted that wiring the relays in parallel was a mistake and not a good engineering practice.

The plaintiff's witnesses supported plaintiff's contention that on the night of the fire the outside temperature was unseasonably cool. As a result of this the night low limit thermostat called for heat in the system, and after the inside temperature had raised to the point set by the thermostat, the thermostat called for the relays to break contact; that one of the relays in the unit malfunctioned and failed to break contact, thus continuing to supply current to the heat element over which no forced air was passing, the fans having stopped on command of the night low limit thermostat. With the passage of time, and without air, the heat element continued to function, raising the temperature to a point where it burned the cabinet and the area immediately around it.

Most of the damage to the room was occasioned by smoke, but the heat unit and cabinet encasing it were destroyed The heat within the unit was obviously intense since it melted one fan motor, wiring was destroyed and pipe connection melted. This severe damage

to the unit makes it improbable that the fire started at some other point in the lecture room and spread to the unit. The only reasonable inference from the testimony and evidence supports the position of the plaintiff that the fire started within the unit and as a result of the malfunction thereof.

Defendant's experts testified as to an experimental test run on another model SB–124, 7.5 kilowatt heating unit, enclosed in a similar cabinet. According to their testimony, the maximum temperature obtained in the heating element during the test was approximately 850° and that the highest temperature to the aluminum grill on top of the unit was 380°. During this experimental operation, no paint was applied to the cabinet. These engineers measured temperatures at various points they felt were important. They testified that the maximum temperatures at the points checked would not burn the material located there. However, they did not determine if other material would have burned at these points. Obviously paper would have burned at the temperatures produced in the test, and it is not unreasonable to assume that some student could have left a notebook or a piece of paper on the grill or near the element. The type of cover used for the heating unit would be an inviting place for a student to leave books while in the lecture room. The defendant knew or is chargeable with notice of the fact that these units were intended for use in a school where books, paper and other inflammable materials could come in contact with the unit.

Plaintiff's expert, Huffstetler, testified that it was apparent from his visual examination of the fan coil unit that the heat was caused by extreme overheating of the heat element. He also found that the aluminum grill on top of the unit was melted away at locations over the support attachments for the heat element, and that this was caused by conduction of heat due to direct contact between the support attachments and the heat element.

The majority of the damage to the room was caused by smoke. The plaintiff introduced into evidence the invoices of the various suppliers and workers required to restore the room to its original condition, plus the cost of a new heating unit. The total of these items was $15,891.00, which amount was either paid by the plaintiff or charged to the plaintiff by the general contractor.

The most reasonable inference from all the evidence is that the fire was caused by the extreme overheating of the heat element which was continuously energized because one of the Klixon relays, wired in parallel, malfunctioned and failed to break contact with the power source. This unit was negligently designed and the negligence of the defendant operated as a proximate cause of the fire and the damages sustained. Based upon all the evidence are the following:

## FINDINGS OF FACT

1. This Court has jurisdiction of the parties and of the subject matter under 28 U.S.C. § 1332.

2. That on October 31, 1967, the plaintiff entered into a subcontract with Lafaye-Tarrant Construction Company, the prime contractor for the construction of Orangeburg-Calhoun Technical Education Center, to furnish and install heating and air conditioning in the Center.

3. The units for the heating and air conditioning equipment were purchased by the plaintiff from the defendant, McQuay, Inc.

4. That on November 22, 1968, at approximately 3:00 a.m., a fire occurred in the lecture room of the Technical Education Center.

5. That the fire was caused by extreme overheating of a McQuay SB–124 model fan coil unit and that said overheating was caused by the malfunction of a Klixon thermal relay wired in parallel and used as a contactor.

6. That the use of two Klixon thermal relays wired in parallel and used as contactors in the heating unit violated good

544

engineering design practices and thus the unit in question was negligently designed, and it was reasonably foreseeable that the unit, as designed, could cause injury and damage to the persons and property when the unit was used for its intended purpose.

7. That the reasonable cost to repair the damages caused by the fire was $15,891.00 and the plaintiff has been damaged in this amount.

## CONCLUSIONS OF LAW

 The law in South Carolina is well established that a manufacturer who fails to exercise reasonable care in the manufacture of a chattel is liable to those whom he should expect to be endangered by its probable use or injuries caused by lawful use of the chattel in the manner and for the purpose for which it was supplied. Salladin v. Tellis, 247 S.C. 267, 146 S.E.2d 875. This principle applies without the necessity of privity between the manufacturer and the injured person. The defendant manufacturer in this case admitted what amounts to negligent design through the testimony of its witness Stevens, and the Court concludes that this negligent design operated as a proximate cause of the fire and the plaintiff's damages. In establishing proximate cause the plaintiff may rely on both direct and circumstantial evidence. Where circumstantial evidence is relied upon it is necessary that the evidence establish the reasonable likelihood or probability of the occurrence and not merely the possibility of the occurrence. The evidence in this case meets the test. Proximate cause is determined upon mixed considerations of logic, common sense and experience, policy and precedent. Ballenger v. Southern Worsted Corp., 209 S.C. 463, 40 S.E.2d 681.

The plaintiff, as a subcontractor, became obligated to the general contractor because of the negligence of the defendant McQuay and is entitled to indemnity from the defendant for the payments made by the plaintiff in the discharge of its liability to the general contractor. S.

C. Electric and Gas Co. v. Utilities Construction Co., 244 S.C. 79, 135 S.E.2d 613.

After careful consideration of all of the evidence and applicable law, it is my opinion that plaintiff is entitled to recover damages from the defendant in the amount of $15,891.00 plus the cost of this action.

It is so ordered.